371 F.3d 68
 In re: NEW TIMES SECURITIES SERVICES, INC. and New Age Financial Services, Inc., Debtors.
Myrna K. Jacobs, Simon and Helga Noveck, Miriam Seidenberg, Felice Linder, Angelo Scarlata, the Rose Marie Ceparano Irrevocable Trust, the Estate of Allan A. Blynd, Salvatore and Stella DiGiorgio, Project Earth Environmental Fundraisers, Inc., New York Optical, Inc., the Carl Carter Irrevocable Trust, Craig Roffman, Ellen Eschen, and Jill Gundry, Claimants-Appellees.
 Docket No. 02-6166.
 United States Court of Appeals, Second Circuit.
 Argued: June 26, 2003.
 Last Supplemental Briefs Filed: July 22, 2003.
 Decided: June 8, 2004.
 
 COPYRIGHT MATERIAL OMITTED James B. Kobak, Jr., Hughes Hubbard & Reed, LLP, New York, NY, for Appellant James W. Giddens as Trustee for the Liquidation of New Times Securities Services, Inc., and New Age Financial Services, Inc.
 Karen A. Caplan, Securities Investor Protection Corporation (Stephen P. Harbeck, General Counsel, on the brief), Washington, DC, for Appellant Securities Investor Protection Corporation.
 Sigmund S. Wissner-Gross, Heller Horowitz & Feit, P.C., New York, N.Y. (May Orenstein, Heller Horowitz & Feit, P.C., New York, NY, Ted A. Berkowitz, Farrel Fritz, P.C., Uniondale, NY, on the brief), for all Claimants-Appellees other than Jill Gundry.
 Giovanni P. Prezioso, General Counsel, Securities and Exchange Commission (Jacob H. Stillman, Solicitor, Hope Hall Augustini, Senior Litigation Counsel, on the brief), Washington, DC, for amicus curiae Securities and Exchange Commission.
 Before: STRAUB and POOLER, Circuit Judges, and HURD, District Judge.*
 STRAUB, Circuit Judge.
 
 
 1
 The Claimants-Appellees (the "Claimants") whose reimbursement is the subject of this appeal are individuals and entities that were fraudulently induced by William Goren to purchase shares in bogus mutual funds offered by his investment companies, New Times Securities Services, Inc. ("New Times") and New Age Financial Services, Inc. ("New Age") (collectively, the "Debtors"). After Goren's long-running scheme was exposed, the United States District Court for the Eastern District of New York (Thomas C. Platt, Judge) ordered that the assets of New Times and New Age be liquidated pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), 15 U.S.C. §§ 78aaa-78lll (2003).
 
 
 2
 In the course of that liquidation, the SIPA Trustee concluded that the Claimants were eligible to receive cash advances from the Securities Investor Protection Corporation ("SIPC"), but that they had "claims for cash" subject to a $100,000 reimbursement limit under SIPA. He set the value of the claims at the amount of money that the Claimants paid to the Debtors to purchase the bogus funds. The Claimants filed objections to the Trustee's determinations and the District Court sustained the objections, holding that (i) the Claimants, in fact, had "claims for securities" eligible for much more generous SIPC advances of up to $500,000, and (ii) the claims were properly valued according to the equity positions reflected in the Claimants' final account statements from the Debtors, which included interest and fictitious dividend reinvestments. The Trustee and SIPC appeal from that ruling.
 
 
 3
 This appeal requires resolution of issues of first impression in the Second Circuit. We hold today that the District Court properly determined that the Claimants had "claims for securities" under SIPA but we find that the District Court erred by calculating the value of those claims by reference to the fictitious account statements that the Claimants received from the Debtors. Instead, each Claimant's net equity should be calculated by reference to the amount of money the Claimants originally invested with the Debtors (not including any fictitious interest or dividend reinvestments). In so holding, we decline to adopt SIPC's narrow reading of the relevant SIPA provisions and, instead, defer to the SEC's persuasive interpretation of the statute.
 
 BACKGROUND
 A. Goren's Fraud
 
 4
 From approximately 1983 until 2000, through New Times and New Age, Goren defrauded hundreds of Long Island and Queens, New York investors out of approximately $32.7 million.[1] Goren's scheme was multifaceted. He solicited customers of New Age and New Times to invest in (i) one or more non-existent money market funds (often called the New Age Securities Money Market Fund), (ii) shares of bona fide mutual funds (from, e.g., The Vanguard Group and Putnarn Investments), that were never, in fact, purchased, and (iii) fraudulent promissory notes issued by Goren and/or New Age. Instead of investing these customers' funds as represented, Goren misappropriated the money.[2]
 
 
 5
 On February 17, 2000, the SEC filed a complaint in the United States District Court for the Eastern District of New York against Goren and New Age (and naming New Times as a relief defendant), alleging violations of the Securities Acts and seeking preliminary and permanent injunctive relief. The following day, the District Court (Thomas C. Platt, Judge) issued a preliminary injunction freezing Goren's assets and appointed a temporary receiver for New Age and New Times. Goren eventually pleaded guilty to securities fraud charges arising from his role in orchestrating and operating this far-reaching scheme. He is currently serving an 87-month prison sentence.
 
 B. The SIPA Liquidation
 
 6
 On May 18, 2000, the District Court ordered that New Times, a registered member of SIPC,[3] be liquidated pursuant to SIPA. Upon the recommendation of SIPC, the court appointed James W. Giddens to serve as the Trustee for the New Times liquidation. The proceeding was referred to the United States Bankruptcy Court for the Eastern District of New York (Stan Bernstein, Bankruptcy Judge). (New Age remained in receivership under the jurisdiction of the District Court.)
 
 
 7
 During a standard SIPA liquidation, the trustee must "satisfy net equity claims of customers" of the failed broker-dealer. 15 U.S.C. § 78fff(a)(1)(A)-(B). Each customer's "net equity" is "the dollar amount of the account or accounts of a customer, to be determined by calculating the sum which would have been owed by the debtor to such customer if the debtor had liquidated, by sale or purchase on the filing date, all securities positions of such customer" corrected for "any indebtedness of such customer to the debtor on the filing date."[4] Id. § 78lll (11). These net equity claims are paid first by a pro rata distribution of "customer property," which is defined as "cash and securities" held by the debtor (excluding any non-negotiable securities held in a particular customer's name). Id. § 78lll (4).
 
 
 8
 SIPC maintains a substantial reserve fund that is supported by assessments on SIPC members' revenues and by interest generated from its investments in U.S. Treasury notes.[5] See id. § 78ddd(a), (c); see also Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 66 (2d Cir.2000); U.S. GENERAL ACCOUNTING OFFICE, PUB. NO. GAO-03-811, SEC. INVESTOR PROT.: UPDATE ON MATTERS RELATED TO THE SIPC 8 (2003), available at http:// www.gao.gov ("2003 GAO REPORT"). To the extent that a customer's net equity exceeds his ratable share of customer property, the trustee may use SIPC advances from this fund to pay customers in cash or to purchase replacement securities for a customer.[6] 15 U.S.C. §§ 78fff-2(d), 78fff-3(a).
 
 
 9
 These SIPC advances are subject to one of two limits under SIPA, which is why the determination of whether a customer has a "claim for cash" or a "claim for securities" must be made. SIPA provides that the "SIPC shall advance to the trustee such moneys, not to exceed $500,000 for each customer, as may be required to pay or otherwise satisfy claims for the amount by which the net equity of each customer exceeds his ratable share of customer property." Id. § 78fff-3(a). If, however, any portion of that claim is a "claim for cash, as distinct from a claim for securities, the amount advanced to satisfy such claim for cash shall not exceed $100,000 for each such customer." Id. § 78fff-3(a)(1).
 
 
 10
 Early in the New Times liquidation, the Trustee's review of the operations of New Times and New Age "revealed extensive intermingling of the two entities in communications with the public." Br. for Appellants James W. Giddens and SIPC at 5. As a result, with the approval of SIPC, the Trustee "moved for an order substantively consolidating the estates of New Times and New Age ... so as to maximize recovery to victims of Goren's fraudulent activities, irrespective of whether they had dealt with New Times, the broker-dealer entity or New Age, the non broker-dealer entity." Id. The SEC filed a brief in support of such a consolidation, and on November 27, 2000, the Bankruptcy Court granted the Trustee's motion. As a result, the assets and liabilities of the two entities were pooled and the combined estate has since been administered by the Trustee under the jurisdiction of the Bankruptcy Court. Customer claims have been determined according to SIPA and the debtor, for SIPA purposes, includes both New Times and New Age for claims arising after April 19, 1995, which is the date that New Times became an SEC-registered broker-dealer and a member of SIPC.
 
 
 11
 C. The Trustee's Determination: "Claims for Cash" vs. "Claims for Securities"
 
 
 12
 Over 900 claims have been filed in the liquidation proceeding. The fourteen Claimants whose reimbursement is the subject of this appeal are among 174 claimants who, fraudulently induced by Goren, "invested" in his bogus money market funds ("the Funds" or "the New Age Funds").[7] It is worth noting that there is no suggestion that any of the Claimants, many of whom were elderly retirees, had any suspicion of Goren's criminality or of the non-existence of the New Age Funds in which he claimed to have invested their money. To the contrary, all of the Claimants have indicated that they believed they were investing in low-risk, conservative money market mutual funds.
 
 
 13
 To be clear — and this is the crucial fact in this case — the New Age Funds in which the Claimants invested never existed. They were not organized as mutual funds, they were never registered with the SEC and they did not issue any of the requisite prospectuses for investors. Although the Claimants received confirmations and monthly account statements indicating that their initial payments to the Debtors (and fictitious dividends) were invested in the New Age Funds, in reality, Goren had embezzled their money.
 
 
 14
 Because the claims were for non-existent securities, the Trustee concluded during the liquidation proceedings that the Claimants had "claims for cash" (eligible for only $100,000 in cash advances) and he valued those claims according to the amount paid to the Debtors for the purchase of the bogus shares, less any withdrawals or redemptions by the Claimants. Amounts shown on the Claimants' account statements as dividends or interest earned on the bogus funds were not included in the calculus. SEC v. Goren, 206 F.Supp.2d 344, 347 (E.D.N.Y.2002). The Trustee made it clear to the Claimants that any amounts they were owed in excess of $100,000 would be treated by the Debtors' estate as general unsecured claims, but the Trustee "warned the Claimants that the consolidated New Age and New Times estate would likely lack funds to satisfy any general unsecured claims." Id.
 
 
 15
 Meanwhile, investors who were misled by Goren to believe that they were investing in mutual funds that in reality existed were treated much more favorably. Although they were not actually invested in those real funds — because Goren never executed the transactions — the information that these claimants received on their account statements "mirrored what would have happened had the given transaction been executed." Br. for Appellants James W. Giddens and SIPC at 7 n. 6. As a result, the Trustee deemed those customers' claims to be "securities claims" eligible to receive up to $500,000 in SIPC advances. Id. The Trustee indicates that this disparate treatment was justified because he could purchase real, existing securities to satisfy such securities claims. Id. Furthermore, the Trustee notes that, if they were checking on their mutual funds, the "securities claimants," in contrast to the "cash claimants" bringing this appeal, could have confirmed the existence of those funds and tracked the funds' performance against Goren's account statements. Id.
 
 D. The District Court Decision
 
 16
 Thereafter, the Claimants filed written objections to both (i) the Trustee's determination of their claims as cash claims and (ii) his refusal to compensate them for interest and dividend reinvestments. See Goren, 206 F.Supp.2d at 347. In response, the Trustee (joined by SIPC) moved for an order upholding his determination. Id. While these objections and motions were pending, Bankruptcy Judge Bernstein recused himself from the case. Id. at 348. Thereafter, District Court Judge Platt withdrew the reference and took exclusive jurisdiction of the SIPC proceeding. Id.
 
 
 17
 After reviewing the matter, the District Court denied the Trustee's motion and sustained the Claimants' objections in a May 28, 2002 Memorandum and Order. The court determined that the Claimants had claims for securities and that the value of those claims could be derived from the Claimants' equity positions as stated in their final account statements (including the fictitious interest and dividend reinvestments). Id. at 351-52. The court explained that, in keeping with SIPA policy goals, this result "turns on the transaction notice provided to customers and their legitimate expectations" and "promotes investor confidence." Id. at 351. The District Court relied on the "Series 500 Rules," 17 C.F.R. §§ 300.500-.503, in reaching this conclusion.[8] Goren, 206 F.Supp.2d at 350 (explaining that, under the Series 500 Rules, "receipt of written confirmation of the purchase or sale of a security generally determines what type of claim customers hold"). In the District Court's view, the Trustee's determination erroneously "hinge[d] on the unilateral actions of the fraudfeasor who embezzled his clients' funds." Id. at 351.
 
 
 18
 The Trustee and SIPC promptly filed a Joint Notice of Appeal. On June 20, 2003, responding to our request, the SEC filed an amicus brief in partial support of the Claimants and in partial support of the Trustee and SIPC.
 
 DISCUSSION
 
 19
 This appeal presents several issues of first impression in this Circuit. First, we are called upon to determine whether the Claimants should be treated as having "claims for securities" under section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), which are eligible for SIPC cash advances of up to $500,000, or as having "claims for cash," which are eligible for reimbursement capped at $100,000. Second, if the District Court properly held that the claims were "claims for securities," we must evaluate whether the District Court properly calculated the Claimants'"net equity" by referring to the fictitious securities positions reflected in the Claimants' account statements (which included artificial interest and dividend reinvestments). Finally, in the course of addressing these novel issues of statutory interpretation, we confront the still thornier question of whether and to what degree we ought to defer to the SEC's interpretation of the relevant provisions of SIPA when it directly contradicts SIPC's reading of the statute.
 
 I. THE CONFLICTING INTERPRETATIONS OF SIPA
 
 20
 We review de novo the District Court's conclusions of law, including its interpretation of SIPA and the Series 500 Rules. See Gurary v. Nu-Tech Bio-Med, Inc., 303 F.3d 212, 219 (2d Cir.2002), cert. denied, 538 U.S. 923, 123 S.Ct. 1583, 155 L.Ed.2d 314 (2003); Levy v. Southbrook Int'l Inv., Ltd., 263 F.3d 10, 14 (2d Cir.2001), cert. denied, 535 U.S. 1054, 122 S.Ct. 1911, 152 L.Ed.2d 821 (2002).
 
 
 21
 In this case, the SEC has outlined an interpretation of section 9(a)(1) of SIPA that plainly conflicts with the interpretation being pressed by SIPC and the Trustee.[9] All three agree, however, that (i) the Claimants were "customers" pursuant to SIPA because they "deposited cash with the debtor for the purpose of purchasing securities," 15 U.S.C. § 78lll (2); (ii) the securities in question did not exist and, thus, could not be liquidated or replaced by the Trustee; (iii) the Series 500 Rules do not govern this case; and (iv) the Trustee properly measured the Claimants'"net equity" by reference to the amount of money they paid to Goren and the Debtors to purchase the bogus funds.[10]
 
 
 22
 At this point, the interpretations diverge. The Trustee and SIPC work backward from the determination of the Claimants' "net equity," which is the sum they would have been owed by the Debtors if the Debtors had liquidated, on the filing date, all of the Claimants' securities positions. See 15 U.S.C. § 78lll (11). Because here there were no securities to liquidate, the Trustee had to value the claims according to the amount of "cash" that the Claimants initially paid to the Debtors for their investments in the New Age Funds. For that reason, SIPC and the Trustee conclude the claims are properly viewed as cash claims under section 9(a)(1) and, thus, limited to $100,000 in SIPC advances. See id. § 78fff-3(a)(1).
 
 
 23
 The SEC rejects this outcome-oriented test, instead focusing on Congress's intent in creating the distinction between the two types of claims and, derivatively, on satisfaction of the customer's legitimate expectations. According to the SEC, the Claimants should be treated as having "claims for securities" — regardless of the fact that the securities were fictitious — because they received purchase confirmations and account statements from Goren and the Debtors. Br. for Amicus Curiae SEC at 2, 8.
 
 
 24
 Before we consider whether and to what degree we ought to defer to either interpretation, we must examine the relationship between the SEC and SIPC.
 
 
 25
 II. THE RELATIONSHIP BETWEEN SIPC AND THE SEC
 
 A. SIPA
 
 26
 By the explicit language of SIPA, SIPC is not "an agency or establishment of the United States Government." 15 U.S.C. § 78ccc(a)(1)(A). SIPC asserts that although it is not an agency "per se," it is, under SIPA, "an independent corporation" endowed with "its own voice and responsibilities in the conduct of liquidations and payment of net equity claims from the SIPC Fund." Letter from Harbeck, General Counsel, SIPC, to the Court of 7/3/03 ("Harbeck Letter"), at 1. According to SIPC, the SEC "possesses potential supervisory authority in some but not all areas of SIPC's operations." Id. (citing 15 U.S.C. § 78ggg(c)). Although we agree with SIPC that the drafters of SIPA clearly envisioned roles for both the SEC and SIPC in administering the statute,[11] see 3 THOMAS LEE HAZEN, LAW SECURITIES REGULATION § 14.24 (2002), we find that Congress deliberately limited the authority of SIPC relative to the SEC.
 
 
 27
 The Supreme Court held in Securities Investor Protection Corporation v. Barbour, 421 U.S. 412, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975), that SIPA invests the SEC with "`plenary authority' to supervise the SIPC." Id. at 417, 95 S.Ct. 1733. Indeed, SIPA drafters seem to have anticipated "substantial" and "vigorous" oversight of SIPC by the SEC. H.R. REP. No. 91-1613, at 11-12 (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5265 (explaining that SIPA provides for "substantial oversight on the part of the Commission over the conduct of the affairs of SIPC"); id. at 5266 (noting that the House Committee on Interstate and Foreign Commerce "not only directs, but expects the Commission to use its oversight in a vigorous, but fair, manner"); see also Sec. Investor Prot. Corp. v. Charisma Sec. Corp., 506 F.2d 1191, 1196 & n. 7 (2d Cir.1974) ("In fact, it is contemplated that the SEC will exercise a supervisory role over SIPC performance.").
 
 
 28
 For example, although SIPA provides SIPC with the power to adopt, amend or repeal bylaws and rules as "necessary or appropriate" to further the purposes of SIPA, 15 U.S.C. § 78ccc(b)(3), (4), the SEC may disapprove any such bylaw in whole or in part, and any proposed rule or rule change must be filed with and approved by the SEC before it takes effect, id. § 78ccc(e)(1)(A), (2). Indeed, the Series 500 Rules, 17 C.F.R. §§ 300.500-.503, which the District Court held govern this case,[12] see Goren, 206 F.Supp.2d at 350-51, were proposed by SIPC and approved by the SEC in just that manner, see 17 C.F.R. § 300.100 (explanatory note). SIPA also empowers the SEC to take an even more proactive rule-making role: "The [SEC] may, by such rules as it determines to be necessary or appropriate in the public interest or to carry out the purposes of this chapter, require SIPC to adopt, amend or repeal any SIPC bylaw or rule, whenever adopted." 15 U.S.C. § 78ccc(e)(3) (emphasis added).
 
 
 29
 In addition, the SEC may, "on its own motion," file an appearance in any SIPC-initiated proceeding and "may thereafter participate as a party." Id. § 78eee(c). Even more significantly, "[i]n the event of the refusal of SIPC to commit its funds or otherwise to act for the protection of customers of any member of SIPC," SIPA authorizes the SEC to seek a court order "requiring SIPC to discharge its obligations under [SIPA] and for such other relief as the court may deem appropriate to carry out the purposes of [SIPA]." Id. § 78ggg(b); see also Barbour, 421 U.S. at 417-18, 95 S.Ct. 1733; 3 HAZEN, supra, § 14.24.
 
 
 30
 B. Deference to SIPC's Interpretation Is Inappropriate in this Case
 
 
 31
 Shortly after SIPC was formed, this Court considered, in an entirely different context, the degree of deference that should be accorded to SIPC's interpretation of a different provision of SIPA. Noting its "familiarity with SIPA liquidations," SIPC argued that it should be given deference on a par with that given to an SEC interpretation. Sec. Investor Prot. Corp. v. Charisma Sec. Corp., 506 F.2d 1191, 1196 (2d Cir.1974). The Charisma Securities court noted that while SIPC's expertise "should be accorded weight by a district judge," the court was "hesita[nt] to draw the analogy between the Corporation and the SEC," because the "SIPC is not an independent regulatory agency, ... nor has it yet had the opportunity to establish a long history of knowledgeable and conscientious performance as has the SEC."[13] Id.; see also In re Lloyd Sec., 163 B.R. 242, 253 (Bankr.E.D.Pa.1994) (stating that because SIPC is "not a governmental agency, ... it cannot take advantage of the implicit deference which must be accorded to federal agencies' interpretations of their own pertinent statutory schemes and operative administrative regulations"), aff'd in part, rev'd in part on other grounds, 183 B.R. 386 (E.D.Pa.1995), aff'd, 75 F.3d 853 (3d Cir.1996).
 
 
 32
 Although SIPC now has the "history of knowledgeable and conscientious performance" under SIPA that it lacked when Charisma Securities was decided, its status vis-à-vis the SEC — and as a non-agency — has not changed. SIPC argues that other government-created corporations have been accorded Chevron-style deference, see Harbeck Letter at 6 (citing Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990); Velazquez v. Legal Servs. Corp., 164 F.3d 757 (2d Cir.1999), aff'd, 531 U.S. 533, 121 S.Ct. 1043, 149 L.Ed.2d 63 (2001)), but we find that the entities at issue in those cases are dissimilar to SIPC in critical respects. The Pension Benefit Guaranty Corporation ("PBGC") was established as an entity "within the Department of Labor," with the power "to adopt, amend, and repeal" necessary "bylaws, rules, and regulations." 29 U.S.C. § 1302(a), (b)(3). As such, we have characterized PBGC as a "federal agency." Jones & Laughlin Hourly Pension Plan v. LTV Corp., 824 F.2d 197, 201 (2d Cir.1987); see also LTV Corp., 496 U.S. at 647, 110 S.Ct. 2668 (repeatedly characterizing PBGC as an agency). SIPC, on the other hand, does not have similar authority.
 
 
 33
 With respect to the Legal Services Corporation ("LSC"), the other government-created corporation cited by SIPC, the SEC notes that although LSC is not a government agency, it is unlike SIPC because "its enabling statute gives it final authority to promulgate rules." Letter from Prezioso, General Counsel, SEC, to the Court of 7/21/03 ("Prezioso Letter"), at 8. We agree. See Texas Rural Legal Aid, Inc. v. Legal Servs. Corp., 940 F.2d 685, 689-90 (D.C.Cir.1991) (according Chevron deference to LSC interpretation because, although LSC is not an agency, "Congress has entrusted LSC with the duty to administer the [Legal Services Corporation] Act and ... has delegated to LSC the authority to fill any gap left ... by Congress" through "notice-and-comment rulemaking..., indicating that Congress intended that it be treated for these purposes like an agency of the government") (citations and internal quotation marks omitted).
 
 
 34
 This case is also distinguishable from LTV Corp. and Velazquez because the SEC — the agency with "`plenary authority' to supervise the SIPC," Barbour, 421 U.S. at 417, 95 S.Ct. 1733 — has proffered a competing view of the meaning of the statute. The Trustee and SIPC suggest, however, that the SEC's oversight and rule-making authority has somehow atrophied because, in the over thirty years since SIPA's creation, it has never been exercised meaningfully. Harbeck Letter at 2. While the SEC's historically laissez-faire approach to its SIPA responsibilities is relevant to our deference analysis, see infra at 80-83, we do not believe it has effected the shift in the balance of power between the two organizations that SIPC and the Trustee seem to envision.[14]
 
 
 35
 In Chao v. Russell P. Le Frois Builder, Inc., 291 F.3d 219 (2d Cir.2002), we addressed a similar problem where "two administrative agents" — the Secretary of Labor and the Occupational Safety and Health Review Commission — offered competing views of the statute at issue. Id. at 226. We held that the very first step of that deference analysis required a choice between the two agencies: "For purposes of [the deference] analysis, then, we must first decide to which administrative actor — the Secretary or the Commission — Congress `delegated authority ... to make rules carrying the force of law.' Only then can we decide the nature or extent of that deference." Id. (quoting United States v. Mead Corp., 533 U.S. 218, 226-27, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (citation omitted)). While SIPC clearly plays an essential administrative role, Congress deliberately chose not to grant SIPC agency authority, see 15 U.S.C. § 78ccc(a)(1)(A), and instead invested "plenary authority" over SIPA with the SEC, Barbour, 421 U.S. at 417, 95 S.Ct. 1733. Thus, while SIPC's proposed construction of the statute is a relevant part of our analysis — and will certainly inform the level of deference we accord to the SEC's reading of the statute — it is not an interpretation to which we must necessarily defer.[15] We confine our holding to the unique facts of this case where the SEC has offered a competing and more persuasive interpretation of the statute. We do not consider what measure of deference an SIPC interpretation might warrant under other circumstances, e.g., when it alone speaks to the meaning of one of its rules. Our decision in Charisma Securities left that general question open and we do so here as well.
 
 
 36
 Ultimately, we agree with the SEC that "[w]hatever SIPC's expertise in overseeing SIPA liquidations, Congress did not intend for the Commission's interpretations of SIPA to be overruled by deference to the entity that was made subject to the Commission's oversight." Prezioso Letter at 8. The SEC has also highlighted that, under the statutory scheme, if SIPC filed a proposed rule that set forth its current interpretation of section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), the Commission would, after considering whether the proposed rule was consistent with SIPA and in the public interest, have authority to deny approval of such a rule. Id. Even more compelling, the SEC argues that it could require SIPC to adopt a rule that sets forth what the SEC believes is the appropriate interpretation of section 9(a)(1). Id. We agree that deference to SIPC, under the circumstances presented here, would impermissibly undermine that statutory hierarchy. Whether the SEC interpretation of section 9(a)(1) deserves deference from this Court is a separate question to which we now turn.
 
 
 37
 III. THE SEC'S INTERPRETATION IS PERSUASIVE AND MERITS SKIDMORE DEFERENCE
 
 
 38
 A. Mandatory Chevron Deference Is Unwarranted in this Case
 
 
 39
 The first question we must ask in the deference analysis is "whether Congress has directly spoken to the precise question at issue." Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Of course, if congressional intent could be discerned from the face of SIPA, our deference inquiry would be over because "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Id. at 842-43, 104 S.Ct. 2778; see also United States v. Gayle, 342 F.3d 89, 92 (2d Cir.2003) ("Statutory construction begins with the plain text and, if that text is unambiguous, it usually ends there as well."). SIPA does not address the precise issue presented in this case. The statute fails to provide any definition of a "claim for cash." See 15 U.S.C. § 78lll. None of the provisions outlines how the Claimants — who were fraudulently misled to "invest" their money in Goren's bogus securities — should be treated. This is precisely the type of "interstitial" question anticipated by Chevron and its progeny. See, e.g., Barnhart v. Walton, 535 U.S. 212, 222, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002).
 
 
 40
 In light of the statute's silence, and because we have an agency interpretation of section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), the second Chevron step requires that, as opposed to proceeding to construe the statute ourselves (as we usually would), we must determine whether the SEC's interpretation "is based on a permissible construction of the statute." Chevron, 467 U.S. at 843, 104 S.Ct. 2778. "If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, we give the administrator's judgment `controlling weight.'" NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 257, 115 S.Ct. 810, 130 L.Ed.2d 740 (1995) (quoting Chevron, 467 U.S. at 844, 104 S.Ct. 2778); see also SEC v. Zandford, 535 U.S. 813, 819-20, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002) (explaining that SEC's interpretation of "the ambiguous text of § 10(b) ... is entitled to deference if it is reasonable").
 
 
 41
 There are several reasons that the mandatory deference envisioned by Chevron would be inappropriate here. First, although the SEC has clearly had the power to draft rules to address this ambiguity in SIPA, the interpretation proffered in its brief has never been articulated in any rule or regulation.[16] As the SEC admits, "[o]ther than the Series 500 Rules, which the Commission does not interpret to cover fictitious securities, the Commission has not defined by regulation the terms in Section 9(a)." Prezioso Letter at 6. In United States v. Mead Corp., 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001), the Supreme Court explained that it "ha[s] recognized a very good indicator of delegation meriting Chevron treatment in express congressional authorizations to engage in the process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." Id. at 229, 121 S.Ct. 2164 (emphasis added). While the fact that the SEC interpretation has not been expressed in the form of a rule or regulation crafted after notice and comment does not alone determine the applicability of Chevron, see id. at 230-31, 121 S.Ct. 2164; Walton, 535 U.S. at 222, 122 S.Ct. 1265, taken together with the factors discussed infra, it counsels against affording Chevron deference to the SEC's interpretation.
 
 
 42
 Second, it appears that the position taken by the SEC in its brief is one that it has not previously articulated in any form. Cf. Local 705, Int'l Bhd. of Teamsters v. Daniel, 439 U.S. 551, 566 & n. 20, 99 S.Ct. 790, 58 L.Ed.2d 808 (1979) (noting that "considerable weight" is given to "an administrative agency's consistent, longstanding interpretation of the statute under which it operates") (emphasis added). To be clear, while the SEC's articulation of this position is new, the issue certainly is not. The SEC acknowledges that SIPC has long held its position regarding the treatment of non-existent securities. SIPC first articulated this argument — that a claim for fictitious securities is properly treated as a claim for cash — in cases that arose over a decade ago. See Plumbers and Steamfitters Local 490 Severance and Ret. Fund v. Appleton (In re First Ohio Sec. Co.), No. 93-3313, 39 F.3d 1181 (table), 1994 WL 599433, at *1 (6th Cir. Nov.1, 1994) (unpublished decision) (finding that "the only legal conclusion possible" where claimants sought SIPC advances for securities that "never even existed" was that the claims were "for cash" and not "for securities"), cert. denied, 514 U.S. 1018, 115 S.Ct. 1362, 131 L.Ed.2d 219 (1995); Appleton v. Hardy (In re First Ohio Sec. Co.), No. 590-0072 (Bankr.N.D.Ohio Dec. 1, 1992) (unpublished order affirming trustee's determination that a claim for non-existent securities is a "claim for cash"). SIPC also apprised the SEC of its position on this issue in its 1993 and 1994 Annual Reports. Harbeck Letter at 9.
 
 
 43
 Third, the SEC concedes that its new interpretation of SIPA has been expressed "for the first time ... in an amicus brief filed at the request of this Court" and that, under those circumstances, its interpretation "may not be entitled to Chevron deference." Prezioso Letter at 6. As we observed in Callaway v. Commissioner, 231 F.3d 106 (2d Cir.2000), the Supreme Court has "accorded deference, even to agency interpretations appearing for the first time in an amicus brief, where there `is simply no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter in question.' A new, and therefore inconsistent position, may yet be `fair and considered.' " Id. at 132 (citations omitted); see also Cedar Rapids Cmty. Sch. Dist. v. Garret F. ex rel. Charlene F., 526 U.S. 66, 74-75 n. 6, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999); Auer v. Robbins, 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997). But cf. Christensen v. Harris County, 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) ("Interpretations such as those in opinion letters — like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law — do not warrant Chevron-style deference."). The SEC's opinion is certainly not the sort of "`post hoc rationalization'... to defend past agency action against attack" about which the Supreme Court has registered concern. Auer, 519 U.S. at 461-62, 117 S.Ct. 905 (citation omitted). We have no reason to doubt that the SEC's interpretation was the product of careful consideration. And the SEC's familiarity with this case from its inception lends credence to its view. Nevertheless, the SEC submitted its brief only after being invited to do so (and only once this dispute reached appeal).[17] Indeed, in some cases, we have declined to consider arguments raised for the first time in an appellate amicus brief. See, e.g., Concourse Rehab. & Nursing Ctr., Inc. v. DeBuono, 179 F.3d 38, 47 (2d Cir.1999). This, then, is another consideration that weighs against Chevron deference.
 
 
 44
 Finally, the SEC's historical relationship with SIPC and SIPC's arguably greater familiarity with the provisions of SIPA are yet additional reasons to decline to apply Chevron deference to the SEC's interpretation of SIPA. Chevron deference is predicated, in part, on the perceived superior expertise of the agency in question. See Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 651-52, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990) ("[P]ractical agency expertise is one of the principal justifications behind Chevron deference."). With respect to SIPA and the determinations made by the Trustee and SIPC during liquidation proceedings, the SEC's role involves more removed oversight. Indeed, if the conduct of this litigation is any indication, it appears that the SEC generally adopts a hands-off approach with respect to SIPC liquidations (and litigation). As a result, the SEC's "expertise" in this context is arguably less compelling than it would be with respect to those portions of the Securities Exchange Act as to which it takes a more proactive day-to-day role. Cf. Bowen v. Am. Hosp. Ass'n, 476 U.S. 610, 643 n. 30, 106 S.Ct. 2101, 90 L.Ed.2d 584 (1986) (noting that where the Department of Health and Human Services was one of twenty-seven agencies responsible for promulgating regulations forbidding discrimination, "there is ... not the same basis for deference predicated on expertise as we found [in Chevron]").
 
 
 45
 For these reasons, we find that the "informal opinion" proffered by the SEC in its amicus brief "lacks the force of law" and thus does not warrant Chevron deference. Chao, 291 F.3d at 227.
 
 B. Skidmore Deference Is Appropriate
 
 46
 The fact that Chevron is inapplicable to this case does not mean that the SEC's interpretation will merit no deference whatsoever. Instead, it warrants the more limited standard of deference adopted by the Supreme Court in Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944). See United States v. Mead Corp., 533 U.S. 218, 234, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("Chevron did nothing to eliminate Skidmore's holding that an agency's interpretation may merit some deference whatever its form, given the `specialized experience and broader investigations and information' available to the agency.") (quoting Skidmore, 323 U.S. at 139, 65 S.Ct. 161); Esden v. Bank of Boston, 229 F.3d 154, 169 n. 19 (2d Cir.2000), cert. denied, 531 U.S. 1061, 121 S.Ct. 674, 148 L.Ed.2d 652 (2001). As the Skidmore Court explained, the level of deference owed to any particular interpretation depends upon "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control." 323 U.S. at 140, 65 S.Ct. 161; see also Mead, 533 U.S. at 239, 121 S.Ct. 2164. In Community Health Center v. Wilson-Coker, 311 F.3d 132 (2d Cir.2002), we outlined the factors that inform our Skidmore analysis, including "the agency's expertise, the care it took in reaching its conclusions, the formality with which it promulgates its interpretations, the consistency of its views over time, and the ultimate persuasiveness of its arguments." Id. at 138, 65 S.Ct. 161.
 
 
 47
 Applying the Community Health Center factors in this case, we find that several factors — most notably the persuasiveness of the SEC's interpretation — weigh in favor of deference to the SEC's reading of section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1). Under the federal securities laws, the SEC is responsible for regulating broker-dealers, administering the securities exchanges and protecting the public interest. The protections outlined in SIPA are merely one aspect of this much broader legislative scheme. Although the SEC has not always played a direct role in administering SIPA, its general oversight of the securities laws gives it expertise that merits some degree of deference. We decline to accord the SEC interpretation the "considerable deference" it requests, because the SEC has not had the kind of history of consistent interpretation of section 9(a)(1) that prompted our holding in Community Health Center. See 311 F.3d at 139. As we did in Community Health Center, we decline to determine "the exact molecular weight of the deference" to be accorded to the SEC's position without analyzing the persuasiveness of its interpretation (the final Skidmore factor). Id. at 137-38, 65 S.Ct. 161.
 
 
 48
 C. The SEC's "Claims for Securities" Analysis Is Persuasive
 
 
 49
 The SEC disagrees with SIPC's "claims for cash" analysis, asserting that the mere fact that the Claimants' net equity is determined by the amount of cash paid for the securities does not mean that the Claimants have claims for cash within the meaning of section 9(a)(1). Br. for Amicus Curiae SEC at 17. Although it notes that the "SIPC's desire for cash-versus-securities consistency among the various provisions [of SIPA] is not an unreasonable approach," the SEC argues that the provisions relied upon by SIPC to supply this definition do not mention the terms "claim for cash" or "claim for securities." Id. at 14. In fact, the "net equity" definition, see 15 U.S.C. § 78lll (11), upon which SIPC heavily relies, does not even use the word "cash." None of the provisions relied upon by SIPC illuminate the definition of a "claim for cash."
 
 
 50
 1. The SEC's Interpretation Furthers SIPA's Investor Protection Goals
 
 
 51
 Examination of SIPA's legislative history reveals that the SEC's interpretation is better tailored to the original aims of SIPA's drafters. Congress enacted SIPA in 1970, in response to "a rash of failures among securities broker-dealers in the late 1960s" that had resulted in "significant losses to customers whose assets either were unrecoverable or became tied up in the broker-dealers' bankruptcy proceedings." Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 66 (2d Cir.2000). The statute was "designed to effect two aims." H.R. REP. No. 91-1613, at 2-4 (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5257. First, the legislation immediately established "a substantial reserve fund ... [to] provide protection to customers of broker-dealers ... to reinforce the confidence that investors have in the U.S. securities markets." Id. Second, SIPA "strengthen[ed] ... the financial responsibilities of broker-dealers." Id. Later amendments to the statute have reiterated this emphasis on investor protection. In 1978, the statute was amended to, inter alia, "increase[] the amounts available to be distributed in liquidations to each customer from $50,000 to $100,000; no more than $40,000 (instead of the present $20,000) is available to satisfy claims for cash."[18] S. REP. No. 95-763, at 2 (1978), reprinted in 1978 U.S.C.C.A.N. 764, 765. These and other changes included in the 1978 amendments were intended to address the perceived "limitations ... upon SIPC's ability to provide the type and degree of protection for securities customers for which SIPA was enacted. Specifically, these limitations in some cases impair the satisfaction of customers' claims as fully, promptly and efficiently as the Committee believes is desirable." Id. These statutory goals — promoting investor confidence and providing protection to investors — are better served by the SEC's broader reading of section 9(a)(1).[19] See Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) ("We are guided by the familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes.") (interpreting the 1934 Securities Exchange Act).
 
 
 52
 2. The Legislative History of Section 9(a)(1) of SIPA Supports the SEC's Interpretation
 
 
 53
 The distinction between "claims for cash" and "claims for securities" in section 9(a)(1) was introduced into SIPA shortly before the legislation was passed. It appears to have been intended to address concerns raised during the drafting process by the Department of the Treasury and the Board of Governors of the Federal Reserve. In April 1970, the Acting General Counsel of the Department of the Treasury sent letters to the chairmen of the relevant committees of both the Senate and the House stating that Treasury opposed the bills, in part because the proposed limit on cash advances of $50,000 per account far exceeded the $20,000 limit per account on coverage provided by FDIC and FSLIC, and, thus, "could be construed as an indication that the Federal Government attaches greater importance to the preservation of public confidence in broker-dealers than to the preservation of confidence in the banking system."[20] Federal Broker-Dealer Insurance Corporation: Hearings on S. 2348, 3988 and 3989 Before the Subcomm. on Sec. of the Senate Comm. on Banking and Currency, 91st Cong. 79-80 (1970) (letter from Englert to Sparkman); Securities Investor Protection: Hearings on H.R. 13308, 17585, 18081, 18109 and 18458 Before the Subcomm. on Commerce and Fin. of the House Comm. on Interstate and Foreign Commerce, 91st Cong. 148-49 (1970) [hereinafter House Subcommittee Hearings] (letter from Englert to Staggers). The Vice Chairman of the Board of Governors of the Federal Reserve System made a similar observation — that the proposed SIPC "insurance" would be "more generous than coverage afforded depositors" under the FDIC and FSLIC — in a July 1970 letter to the House Committee. House Subcommittee Hearings, supra, at 145-47 (letter from Robertson to Staggers). He indicated, however, that the Federal Reserve Board recognized that "coverage of customers of broker-dealers cannot be entirely parallel to that afforded depositors in banks, because the broker performs a custodial function — as an integral part of customer account services — in holding customers' fully paid securities in safekeeping." Id. He proceeded to explain that "[t]he accounts of customers of broker-dealers thus reflect partly depository claims (credit balances) comparable to claims insured by the FDIC and partly custodial claims comparable not to deposits but to bank trust accounts." Id.
 
 
 54
 Notwithstanding this disparity, both bills emerged from their respective committees without modification of the $50,000 limit, see 116 CONG. REC. 39,358 (Dec. 1, 1970) (draft of H.R. 19333, 91st Cong. § 6(e)(1) (1970)); id. at 40,865-66 (Dec. 10, 1970) (draft of S. 2348, 91st Cong. § 35(m)(11) (1970)), and the House bill containing the $50,000 limit was passed on December 1, 1970, id. at 39,369-70. At a December 10 debate, however, the Senate adopted an amendment proposed by Senators McIntyre and Muskie to reduce the "maximum insurance-type protection" for all SIPA claims from $50,000 to $20,000 in order to "bring investor protection in line with the protections which the Congress has already made available to depositors in banks and shareholders in savings and loan associations." Id. at 40,872 (statement of Sen. McIntyre). Another senator, after observing that it was reasonable to reduce the "coverage for cash" to $20,000 to "bring[] it in line with the insurance coverage for cash deposits" in other institutions, inquired whether "it might be more acceptable and more efficient in restoring confidence if the figure in the original bill with respect to securities only were left at $50,000 and the $20,000 applied to the cash." Id. (statement of Sen. Bennett). After considerable debate, the Senate passed the amended version — reducing all claims to $20,000 — but with an understanding that the issue of a provision with separate limits for cash and securities would receive further examination in conference. Id. at 40,873-77.
 
 
 55
 Shortly thereafter, the Conference Committee reported that it had adopted the two-tiered system envisioned during the Senate debates, distinguishing the amount of protection available for securities claims from that available for cash claims. CONF. REP. NO. 91-1788, at 3 (1970), reprinted in 1970 U.S.C.C.A.N. 5281, 5283 ("The Conference substitute continues the $50,000 limitation, but provides further that, insofar as all or any portion of a customer's claim is for cash (as distinct from securities), the amount advanced for such claim to cash shall not exceed $20,000."). The revised bill (H.R.19333) was passed by both chambers and signed into law on December 30, 1970.
 
 
 56
 In light of this history, we are persuaded by the SEC's view that the dichotomy between "claims for cash" and "claims for securities" in section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), was introduced "to distinguish the custodial functions of a broker-dealer with respect to securities from the broker-dealer's depository-like functions with respect to cash deposits." Br. for Amicus Curiae SEC at 12. The "claims for cash" carve-out in section 9(a)(1) "was intended to ... limit the protection of a brokerage firm customer who uses his account as a depository for cash to the same protection for that cash that bank depositors receive under FDIC coverage." Id. Adopting this view of the statute, we find that because the Claimants directed that the money they placed with the Debtors be used to purchase securities — and, importantly, because they received confirmations and account statements reflecting such purchases — they are not the types of cash depositors envisioned by the drafters of the "claims for cash" provision.
 
 
 57
 3. The Series 500 Rules Support an Outcome Based on the Claimants' Legitimate Expectations
 
 
 58
 As a final source of support for its position, the SEC cites the Series 500 Rules. Under the Series 500 Rules, whether a claim is treated as one for securities or cash depends not on what is actually in the customer's account but on what the customer has been told by the debtor in written confirmations. Thus, if the debtor sends a written confirmation to the customer that the securities in the customer's account have been sold, then the customer has a "claim for cash," even if the sale never took place (unless there is a contract for the sale). 17 C.F.R. § 300.501(a). The customer is also viewed as having a "claim for cash" even if he or she placed an order for the purchase of securities unless (i) the debtor has sent a written confirmation of the purchase; or (ii) the securities have become "the subject of a completed or executory contract for purchase." 17 C.F.R. § 300.501(b). Conversely, another rule makes clear that if the customer's account actually holds cash but the customer received from the debtor a written confirmation of a securities purchase, then the customer has a "claim for securities" in the liquidation. 17 C.F.R. § 300.502(a)(1).
 
 
 59
 The Claimants assert that "the Series 500 rules, by their plain language, unambiguously apply to the classification issue presented here." Wissner-Gross Letter at 2. While the Claimants are correct that the Series 500 Rules address the circumstance of non-existent transactions, there is nothing in the rules suggesting their applicability to cases involving non-existent securities. The SEC and SIPC both indicate that the Rules were promulgated to resolve whether a claim is for securities or cash when a transaction in real securities straddled the filing date and do not govern transactions involving fictitious securities, and we defer to their shared interpretation because we do not find that it is "plainly erroneous or inconsistent with" the Series 500 Rules. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945) (explaining that agency's interpretation of its own regulations is "of controlling weight unless it is plainly erroneous or inconsistent with the regulation"); see also Auer v. Robbins, 519 U.S. 452, 461, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (same).
 
 
 60
 Nevertheless, we are persuaded by the SEC's argument that the premise underlying the Series 500 Rules — that a customer's "legitimate expectations," based on written confirmations of transactions, ought to be protected — supports the SEC's interpretation of section 9(a)(1). See Rules of the Sec. Investor Prot. Corp., 53 Fed.Reg. 10368-69 & n. 3 (Mar. 31, 1988). In the SEC's view, the Claimants in this case should be treated as having claims for securities because the confirmations and account statements that they received from the Debtors stated that the Claimants held securities in their accounts. Br. for Amicus Curiae SEC at 8.
 
 
 61
 SIPC disputes that customers can have "legitimate" expectations as to non-existent securities. We note that SIPC's approach does perhaps promote an arguably laudable policy goal — encouraging investors to research and monitor their investments (and their brokers) with greater care. This goal of greater investor vigilance, however, is not emphasized in the legislative history of SIPA. Instead, as outlined supra at [26-27], the drafters' emphasis was on promoting investor confidence in the securities markets and protecting broker-dealer customers. We find the SEC's interpretation more in line with the goals of the statute and with the legislators' intent in introducing the securities/cash distinction in section 9(a)(1).
 
 
 62
 * * * * * *
 
 
 63
 After reviewing the language of the statute, its purposes of protecting investors and inspiring confidence in the securities markets, and the specific history surrounding the drafting of the relevant language found in section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), we are persuaded by and, thus, defer to the SEC's interpretation. Indeed, even if we were not to adopt the SEC's interpretation as a matter of Skidmore deference, we would independently conclude that it is the proper interpretation of the statute. As the SEC explains:
 
 
 64
 When a customer has been sent confirmations and account statements reflecting his securities purchases and showing that he holds the securities in his account, his claim, in the Commission's view, involves the debtor's function as securities custodian and is one for securities entitled to SIPC protection up to $500,000. Conversely, if the customer is using his brokerage account as a cash depository, as reflected in his account statements, he has a claim for cash entitled to protection up to $100,000 — no more protection than that provided to bank depositors.
 
 
 65
 Br. for Amicus Curiae SEC at 12-13.
 
 
 66
 D. The Claims Should Be Valued According to the Amount Initially Paid by the Claimants to the Debtors for the Purchase of the New Age Funds and Should Not Include Fictitious Interest or Dividend Reinvestments
 
 
 67
 Finally, we must consider how the Claimants' net equity under SIPA should be determined. The District Court made this calculation by relying on the "value" of the bogus securities (including artificial interest and dividends) as set forth in the fictitious account statements that the Claimants received from Goren and the Debtors. See SEC v. Goren, 206 F.Supp.2d 344, 352 (E.D.N.Y.2002). The District Court defended this calculation as necessary to protect the Claimants' "legitimate expectations." Id. at 351.
 
 
 68
 The SEC and SIPC are in agreement that the Claimants' net equity should be valued according to the cash they initially provided to the Debtors to purchase the Funds and should not include any bogus interest or dividend reinvestments. Cf. SEC v. Aberdeen Sec. Co., Inc., 480 F.2d 1121, 1127-28 (3d Cir.) (explaining that a customer's net equity includes cash that the broker should have been holding on the filing date), cert. denied sub nom. Seligsohn v. SEC, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973); Focht v. Athens (In re Old Naples Sec., Inc.), No. 2:00-cv-181-FTM-29D, slip op. at 15-17 (M.D.Fla. Sept. 30, 2002) (calculating net equity according to claimants' initial investment in Ponzi scheme and offsetting that number by any phony interest payments received). As the SEC indicated in its brief, basing customer recoveries on "fictitious amounts in the firm's books and records would allow customers to recover arbitrary amounts that necessarily have no relation to reality.... [and] leaves the SIPC fund unacceptably exposed." Br. for Amicus Curiae SEC at 16. SIPC and the SEC agree that such an approach is irrational and unworkable and we defer to their unanimous and persuasive analysis of the potential absurdities created by reliance on the entirely artificial numbers contained in fictitious account statements. Accordingly, we adopt the view that the Claimants' net equity is properly calculated as the amount of money that the Claimants initially placed with the Debtors to purchase the New Age Funds and does not include the artificial interest or dividend reinvestments reflected in the fictitious account statements that the Claimants received from the Debtors.
 
 CONCLUSION
 
 69
 For the foregoing reasons, we affirm the District Court's determination that the Claimants have "claims for securities" under section 9(a)(1) of SIPA, 15 U.S.C. § 78fff-3(a)(1), but we vacate the District Court's calculation of the value of those claims and remand for further proceedings consistent with this opinion. The judgment of the District Court is hereby affirmed in part and vacated and remanded in part and the Claimants-Appellees may recover two-thirds of their costs on this appeal.
 
 
 
 Notes:
 
 
 *
 The Honorable David N. Hurd, United States District Judge for the Northern District of New York, sitting by designation
 
 
 [1]
 The parties do not dispute the underlying facts of this case
 
 
 [2]
 Goren used some of this money to pay "dividends" on prior investments. Goren's fraud was, thus, a classic "Ponzi scheme," where money contributed by his later customers was paid out as "artificially high dividends for the original investors," which, in turn, attracted additional customers and investments. BLACK'S LAW DICTIONARY 1180 (7th ed.1999) (explaining that, in a Ponzi scheme, "[m]oney from the new investors is used directly to repay or pay interest to old investors, usually without any operation or revenue-producing activity other than the continual raising of new funds");see also United States v. Moloney, 287 F.3d 236, 242 (2d Cir.), cert. denied, 537 U.S. 951, 123 S.Ct. 416, 154 L.Ed.2d 297 (2002).
 
 
 [3]
 Formed pursuant to SIPA, SIPC is a "nonprofit, private membership corporation to which most registered brokers and dealers are required to belong."Sec. Investor Prot. Corp. v. Barbour, 421 U.S. 412, 416, 95 S.Ct. 1733, 44 L.Ed.2d 263 (1975) (citing 15 U.S.C. § 78ccc). SIPC "monitors the activities of broker-dealers and insures customers in the case of a broker-dealer's liquidation." Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 66 (2d Cir.2000).
 
 
 [4]
 SIPA defines a "security" as "any note, stock, ... bond, debenture, evidence of indebtedness, ... transferable share, ... certificate of deposit, certificate of deposit for a security, any investment contract or certificate of interest or participation in any profit-sharing agreement, ... any put, call, straddle, option, or privilege on any security, or group or index of securities (including any interest therein or based on the value thereof),... and any other instrument commonly known as a security." 15 U.S.C. § 78lll (14). According to the District Court, "SIPC considers shares in money market funds organized as mutual funds to be securities, provided those shares are held in customers' securities accounts." SEC v. Goren, 206 F.Supp.2d 344, 350 (E.D.N.Y.2002).
 In this case, the SIPA "filing date" was February 17, 2000, the date that the SEC filed the initial complaint against Goren and the Debtors. See 15 U.S.C. § 78lll (7).
 
 
 [5]
 As of December 31, 2002, the SIPC fund was valued at $1.26 billionSee SEC. INVESTOR PROT. CORP., 2002 ANNUAL REPORT 8, available at http://www.sipc.org/pdf/SIPC_Annual_Report_03.pdf. Since 1996, SIPC members have been assessed $150 per year. Id. at 9. In prior decades, assessment rates fluctuated annually depending on SIPC's expenses during the prior year. See id.; see also 15 U.S.C. § 78ddd(d)(1).
 
 
 [6]
 The parties do not dispute that because the securities at issue in this case never existed, no substitute or replacement securities exist and the Claimants must be paid in cashCf. 15 U.S.C. §§ 78fff-1(b)(1), 78fff-2(b), 78fff-3(a).
 
 
 [7]
 Some of the Claimants also made (or at least believed they had made) other investments through Goren but those investments, which were treated as "claims for securities" by the Trustee, are not the subject of this appeal
 
 
 [8]
 As outlinedinfra at 86-87, the Series 500 Rules provide guidance for determining whether a customer has a cash claim or a securities claim when a relevant transaction straddled the filing date. The customer's "legitimate expectations" are the focus of the rule, which makes the cash/securities determination largely dependent on the receipt of written confirmations.
 
 
 [9]
 SIPC and the Trustee submitted joint briefs
 
 
 [10]
 The Claimants assert that, as the District Court found, the Series 500 Rulesdo dictate the result in this case and Claimants' net equity should be calculated by reference to the fictitious account statements they received from the Debtors.
 
 
 [11]
 We note, however, that SIPC's and the SEC's failure to come to consensus with respect to the issues presented on this appeal seems a far cry from the "cooperation and coordination" anticipated by SIPA's drafters. H.R. REP. No. 91-1613, at 12 (1970),reprinted in 1970 U.S.C.C.A.N. 5254, 5266 ("Only with cooperation and coordination between the efforts of the self-regulatory organizations, SIPC and the Commission, can this legislation see its fullest effectiveness.").
 
 
 [12]
 The Claimants assert that this dispute about whether the SEC or SIPC is owed deference is moot because the Series 500 Rules directly resolve this claim classification issue. Letter from Wissner-Gross, on behalf of the Claimants, to the Court of 7/3/03, at 7-8 ("Wissner-Gross Letter"). As outlinedinfra at 86-87, in light of the persuasive SIPC and SEC analyses to the contrary, we disagree with the District Court's conclusion (and the Claimants' argument) that the Series 500 Rules govern this case and find, instead, that the Series 500 Rules were adopted to deal with transactions involving real, not fictitious, securities. We do, however, agree with the SEC's view that the Rules can be read broadly to support the SEC's reading of the remedial purposes of SIPA.
 
 
 [13]
 SIPC highlights the fact that, four years afterCharisma Securities was decided, "Congress amended SIPA to instruct the courts to place `considerable reliance' on SIPC's views" in determining appropriate trustee fee allowance amounts (the issue from Charisma Securities). Harbeck Letter at 8. We find that amendment cuts both ways. While it certainly explicitly expands the authority of SIPC, it does so only with respect to allowance determinations, an issue that is not presented in this case.
 
 
 [14]
 The SEC certainly cannot be characterized as having engaged in the "substantial supervision" of SIPC that was anticipated by the statute's draftersBarbour, 421 U.S. at 419, 95 S.Ct. 1733. We do note, however, that in recent years, the SEC has been making efforts to improve its oversight of SIPC. See U.S. GENERAL ACCOUNTING OFFICE, PUB. NO. GAO-01-653, SEC. INVESTOR PROT.: STEPS NEEDED TO BETTER DISCLOSE SIPC POLICIES TO INVESTORS 10, 53-59, 87 (2001) (noting that SEC has begun monitoring SIPC liquidations more closely), available at http://www.gao.gov; 2003 GAO REPORT at 3, 13-14 (noting that SEC has broadened the sample of SIPC liquidations it reviews and that SEC has modified internal procedures to make its review of SIPC more streamlined).
 
 
 [15]
 AlthoughChao involved two agencies that naturally begin on more equal footing in a deference analysis, the shared responsibility for rule-making under SIPA — and the SEC's relative non-involvement historically — arguably makes this deference choice a closer call than that presented in Chao. See Chao, 291 F.3d at 226. Even if we were to find that Chao did not require this threshold choice — and that we could somehow manage the analytical awkwardness of a side-by-side deference analysis — we would reach the same ultimate result because we find the SEC's interpretation to be more persuasive than that offered by SIPC. See infra at 83-87].
 
 
 [16]
 We agree with the SEC and SIPC that the Series 500 Rules do not govern this issue. Even if we were to view the text of the Series 500 Rules as ambiguous, we would defer to the SEC's and SIPC's common interpretation
 
 
 [17]
 The SEC asserts, however, that its "prior silence" should not preclude deference to its interpretation of SIPA because "[u]ntil this Court's request for anamicus brief, the Commission has never been asked to interpret Section 9(a) with respect to fictitious securities." Prezioso Letter at 9. We are not persuaded by this explanation for the SEC's silence because the statute explicitly allows SEC intervention and participation in any SIPC proceeding (and does not require the SEC to await an invitation from the court or the parties). See 15 U.S.C. § 78eee(c).
 
 
 [18]
 These numbers were increased to their current levels in 1980See Amendments to the Securities Investor Protection Act, Pub.L. No. 96-433, § 1, 94 Stat. 1855 (1980).
 
 
 [19]
 SIPC emphasizes that the only two authorities that seem to be directly on point (both of which, we note, are unpublished and cursory) support its positionSee Plumbers and Steamfitters Local 490 Severance and Ret. Fund v. Appleton (In re First Ohio Sec. Co.), No. 93-3313, 39 F.3d 1181 (table), 1994 WL 599433, at *1 (6th Cir. Nov.1, 1994) (unpublished decision), cert. denied, 514 U.S. 1018, 115 S.Ct. 1362, 131 L.Ed.2d 219 (1995); Appleton v. Hardy (In re First Ohio Sec. Co.), No. 590-0072 (Bankr.N.D.Ohio Dec. 1, 1992). While SIPC relies heavily on the Third Circuit's 1973 decision in SEC v. Aberdeen Securities Co., Inc., 480 F.2d 1121 (3d Cir.), cert. denied sub nom. Seligsohn v. SEC, 414 U.S. 1111, 94 S.Ct. 841, 38 L.Ed.2d 738 (1973), that decision — which holds that in a case involving non-existent securities, the claimant is entitled to the "cash which the broker has, or should have, been holding," id. at 1127 — does not resolve the issue of the applicability of the then-$20,000 limit on "claims for cash." Clearly, however, the caselaw on this issue is sparse. We do not find these authorities particularly enlightening.
 
 
 [20]
 Apparently, the Department of the Treasury later changed its position. In a December 8, 1970 letter to the Chairman of the Senate Banking and Currency Committee, the Acting Secretary of the Treasury emphasized the Administration's support for S. 2348 and urged its prompt passage. 116 CONG. REC. 40,870 (1970) (letter from Walker to Sparkman)